AMERICAN FOG SIGNAL CO. v. COLUMBIA FIRECRACKER CO. et al.

(Circuit Court, N. D. Ohio, E. D. February 14, 1906.)

No. 6,609.

PATENTS—INFRINGEMENT—RAILROAD TORPEDOES.

The Weaver patent, No. 667,813, for a railroad torpedo, *held* not anticipated, to cover a novel and useful device, and valid as against the defense of prior invention by a defendant. Also held infringed.

In Equity. On final hearing.

A. S. Pattison, for complainant.

J. B. Fay, for defendants.

TAYLER, District Judge. This suit is based upon the alleged infringement, by the defendants, of letters patent No. 667,813, dated February 12, 1901, granted to Wylie W. Weaver, and duly assigned to the complainant, for improvements in railroad torpedoes. The bill alleges infringement, and asks for an injunction restraining the defendants, and each of them, from making, using, or vending, or causing the same to be done, railway torpedoes embodying or employing the inventions covered by the complainant's patent, or from infringing such patents in any way, and for an accounting of profits and damages.

The device covered by the complainant's patent and that manufactured by the defendants are shown by the accompanying drawings:

*Complainant's*        *Defendant's*

By reference to these drawings, it will be observed that the patented torpedo and the defendants' torpedo embody in their structure two cup-shaped metal cases, one of which is telescoped within the other, and that the detonating or explosive compound is held between these two cup-shaped members. It is necessary to embody means for attaching the torpedo to the railroad rail, and in each case it is accomplished by a lead strap adapted to be bent around the tread of a railroad rail in the position shown in figure 1 of the drawing of both

the patented torpedo and the defendants' torpedo. Both of the torpedoes have slots in the edge of the outer case or member, through which the lead strap passes, and the walls of these slots serve to unite the strap to the torpedo. In each torpedo the strap is so passed that it extends across the outer face of the inner member, and serves to hold these two members together. The strap is the only structural means in each case for locking the two members together, and positively preventing their separation. Another construction common to both the patented and the defendants' torpedoes is that each is provided with a marginal stiffening and strengthening reinforcement, or flange, completely surrounding the case. In both the patented torpedo and the defendants' torpedo the marginal stiffening and strengthening reinforcement, or flange, serves to connect the lead strap to the torpedo; and the marginal stiffening or strengthening reinforcement, or flange, is the sole means of uniting or connecting the lead strap to the torpedo.

This suit is based upon claims 1, 2, and 3 of the Weaver patent, which are as follows:

"(1) A signal-torpedo, comprising opposite telescoping members, detonating material held between the members, one of the latter having a marginal stiffening or strengthening reinforcement, and a strap extending transversely across the outer end of the inner member and projecting outwardly in opposite directions through corresponding openings formed in the marginal wall of the outer member, the intermediate portion of the strap forming the sole means for connecting the members, and the opposite ends of the strap forming rail-engaging devices.

"(2) A signal-torpedo, comprising opposite telescoping members, detonating material held between the members, the outer member having its free edge provided with an external stiffening and strengthening flange, and a strap extending transversely across the outer end of the inner member and projecting outwardly through corresponding openings in the outer member, the intermediate portion of the strap forming means for connecting the members, and the opposite ends of the strap bearing across the outer side of the flange, and also forming rail-engaging devices.

"(3) A signal-torpedo, comprising opposite telescoping members, detonating material held between the same, an external marginal reinforcement for the outer member, and opposite rail-engaging devices connected to the reinforcement."

It will be noticed that complainant's device is constructed with a bead and wire, with the slotted opening, while the defendants' device has a projecting flange with the slot. These are practically the same construction, and the defendants' device is specifically covered by claim 2, which provides for "an external stiffening and strengthening flange."

The similarity of the two devices thus appearing, two main questions are presented: First. As to the validity of the patent, involving (a) its novelty and usefulness, and (b) whether it was anticipated by prior patents; and, second, whether the claim of the defendants, that one of them, Matthew, himself discovered and used this device before it was invented and patented by Weaver, the patentee of the patent which is the basis of the complainant's bill, is established.

First. The question of the validity of the patent, as to its novelty, usefulness, and anticipation by prior patents, is easily disposed of:

(a) The device is novel and useful. It is simple, economical of construction, the three parts can be assembled by hand without the use of force which might prematurely explode the detonating contents, and it seems to be, of all the devices of its kind, the simplest and most effective. (b) In its essential features it departs materially from the prior patents, and is not anticipated by them.

Second. The chief contention arises over the claim of prior invention by Matthew, and, in respect to it, a large amount of conflicting testimony has been taken.

Upon the whole, the claim of Matthew does not impress me as being justified by the facts. Dismissing, for the moment, the account which he gives of the manner in which he discovered it, it would seem to be absolutely inconceivable that, considering the extent of its claimed manufacture and use, there should not now be the slightest disinterested evidence to support it. The two parts of the device are the shell, consisting of two pieces, and the lead straps by which they are fastened together and the whole torpedo fastened to the rail. It is shown by the defendants' testimony that in the fall of 1899, about the time, or shortly after the time, when he claims to have invented this device, he ordered lead for straps from a jobber of these articles in Cleveland. There is no doubt that this order was given; but it is also as apparent as anything in this case can be that the defendants were arranging, at the time when this lead was ordered for straps, to manufacture torpedoes made out of paper, and under a contract which had been theretofore made with Dutcher, who had experience in that branch of manufacture. These paper torpedoes required the use of lead straps, or tapes. So that the testimony as to the lead straps is wholly consistent with another purpose, which was evidently in the minds and plans of the defendants.

The witness Matthew testifies: First, that he ordered some sample shells from a tinner named Russell in Toledo. He is unable to give this man's first name, to tell the street on which he did business, or in any way to identify the person, beyond saying that he had a place, or worked, on a street leading off from the main street parallel with the river. Second, that he gave a verbal order to the E. P. Breckenridge Company, of Toledo, for a million tin shells. The books of the Breckenridge Company show that the only transaction which Matthew or his company had in 1899, at or about the time when he claims to have given this order, and for a long time thereafter, involved a small order for powder cans, the bill for which was $15.75. The testimony of a man named Rose was to the effect that in the fall of 1899 a die was made at the Breckenridge works for such shells as are in controversy here; but the testimony of Winter, the head bookkeeper of the Breckenridge Company at the time in question, and of the superintendent in charge of such work, and documentary evidence, show conclusively that the witness Rose is in error as to the time, and that the transaction to which he refers took place in the fall of 1900, and that the die was made for the predecessor of complainant. The witness Matthew testifies that these million shells were manufactured into torpedoes during the following year or 15 months after they were

received; that is to say, during the year 1900, and early in 1901. He thinks he remembers two railroads to which torpedoes were sold, but not an item of evidence is produced, and no railroad officer or employé testifies, that any of these million torpedoes were ever purchased from the defendant company. It is true the claim is made that the books in which the accounts were kept were destroyed by fire; but it is past belief that enough could not be remembered by the persons who had in that year sold such a vast number of these torpedoes to suggest some places in which inquiry might be made respecting them.

Besides this, several employés of the defendant, working for the defendants during the time that it is claimed these torpedoes were made, employés who must have known of it if it had been true, testify positively that no such torpedoes were made during that time. Other evidence points to the same conclusion, and other facts appear which, as it seems to me, are inconsistent with the claim of the defendants that one of them discovered this device prior to its being patented by Weaver.

Here were a million cases which must have been manufactured by somebody; a million shells filled, assembled, and straps applied, by employés in defendants' factory; a million shells shipped over various railways, and sold to, and used by, various customers; and not a syllable of disinterested or credible evidence of it survives. No man remembers it, and no written evidence of it can be found. If the conclusion to which I have arrived does injustice to the defendants, it must be confessed that there has been such an annihilation of ordinarily enduring and producible testimony as is unparalleled in the history of litigation. I cannot believe that such a calamity has happened, or can happen.

The complainant is entitled to the relief prayed for, and a decree may be entered accordingly.